IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 11, 2018

## KENNETH A. JONES v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Davidson County
### No. 2012-A-869    Mark Fishburn, Judge

_____

### No. M2018-00632-CCA-R3-PC

_____

The petitioner, Kenneth A. Jones, appeals the denial of his petition for post-conviction relief, which petition challenged his Davidson County Criminal Court jury conviction of robbery. In this appeal, the petitioner reiterates his claim that he was deprived of the effective assistance of counsel. Because the petitioner has failed to establish that he is entitled to post-conviction relief, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and J. ROSS DYER, JJ., joined.

David M. Hopkins, Nashville, Tennessee, for the appellant, Kenneth A. Jones.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Mindy Morris, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

A Davidson County Criminal Court jury convicted the petitioner, who was originally charged with aggravated robbery, of one count of robbery, and the trial court sentenced the petitioner, a Career Offender, to 15 years' incarceration.

At the petitioner's July 2015 trial, the victim, Srikanth Appogigudam, testified that on November 6, 2011, he was robbed at gunpoint in the laundry facility of his apartment complex. *See State v. Kenneth A. Jones*, No. M2015-02045-CCA-R3-CD, slip op. at 2 (Tenn. Crim. App., Nashville, Sept. 12, 2016). The perpetrator, whom the victim had identified via a photographic array prior to trial as the petitioner, took the victim's cellular telephone, car keys, some loose change, and the victim's Toyota

Corolla. "The victim testified that in addition to the car's title, the car contained a Garmin global positioning system (GPS) unit that he used to navigate around Nashville and that had his home address stored in it." *Id.* During a pat down of the petitioner that occurred on the morning of November 21, 2011, Metropolitan Nashville Police Department ("Metro") Detective William Traughber "found a single key with a Toyota emblem on it." *Id.* The petitioner claimed that the key belonged to his girlfriend's car, but the petitioner's girlfriend "denied that the car belonged to her." *Id.*

> Detective Traughber testified that the key fit a Toyota Corolla in the same parking lot. The tag on the Toyota came back registered to a stolen 2006 Nissan Altima, and the vehicle identification number came back as the vehicle stolen from the victim on November 6, 2011. Inside the Pontiac that [the petitioner] had been driving, police recovered a Garmin GPS unit. An officer turned on the unit and pressed the home button, which showed the victim's address.

*Id.*

In his timely-filed petition for post-conviction relief, the petitioner claimed, among other things, that he was deprived of the effective assistance of counsel due to his counsel's inexperience. In an amended petition for post-conviction relief filed by post-conviction counsel, the petitioner added claims that his counsel performed deficiently by failing to seek exclusion of the petitioner's prior robbery convictions, by failing to "locate and present witnesses" on the petitioner's behalf, by failing to adequately prepare the single defense witness to testify, by failing to present evidence promised to the jury during his opening statement, by failing to prepare the petitioner to testify, by failing to adequately cross-examine the victim, by failing to object to improper closing argument from the prosecutor, and by abandoning meritorious issues on appeal.

At the November 2017 evidentiary hearing, the petitioner testified that his counsel made no effort prior to trial to have the trial court determine whether the petitioner's previous convictions of aggravated robbery would be admissible if the petitioner chose to testify. The petitioner said that counsel advised him against taking the stand because his doing so would have allowed the State to inquire as to his previous convictions. The petitioner testified that he wanted to testify "to tell exactly how and what happened," but counsel warned him that his taking the stand was inadvisable given his prior criminal history. The petitioner said that he suggested to counsel that he could "be honest with the jury" and emphasize that he had pleaded guilty in the prior cases because he was guilty, but counsel "just thought [that] was a bad idea." Counsel did not prepare the petitioner to testify, and, as a result, the petitioner elected not to do so. The

petitioner acknowledged that he told the trial court during the *Momon* hearing that it was his choice not to testify, but he claimed that he "didn't know at that point in time that [he] could tell the Court that [he] wanted to testify" and "just simply went along with . . . waiving that right." The petitioner said that he was also unaware that trial counsel could have sought to exclude his prior convictions prior to trial.

The petitioner testified that he asked counsel to present Dea McGee, Brian Ceasar,[1] and Tenael Morris as well as "the company Comcast" as witnesses at trial. The petitioner clarified that Ms. Morris had testified at trial, but he claimed that trial counsel failed to prepare her to testify and failed to rehabilitate her following cross-examination by the State. The petitioner said that the day of trial, Ms. McGee was in court, prepared to testify, and after Ms. Morris testified, trial counsel elected not to call Ms. McGee, telling the petitioner that he believed "Ms. Morris' testimony was sufficient for any reason or another." The petitioner said that Mr. Ceasar "never received the subpoena in order to be able to get off work to come to court." The petitioner said that both Ms. McGee and Mr. Ceasar would have corroborated Ms. Morris' testimony that the petitioner could not have robbed the victim on November 6, 2011, because he had been helping Ms. Morris move all day. The petitioner added that trial counsel performed deficiently by telling the jury that Ms. McGee and Mr. Ceasar would testify and then failing to call them as witnesses. The petitioner said that the State emphasized the absence of that testimony during closing argument.

The petitioner claimed that trial counsel should have attempted to subpoena the Comcast contractors who had come to Ms. Morris' residence that day to connect her cable, insisting that he was "quite sure they'll probably remember" because the petitioner "had passed gas and stepped outside, one of the guys came through it and we made a joke about it for a while."

The petitioner testified that trial counsel performed deficiently by failing to adequately cross-examine the victim about the victim's inability to identify the petitioner during trial. The petitioner said that counsel should have attempted to pin the victim down rather than allowing the victim to continue answering, "I don't recall." Additionally, the petitioner said that trial counsel did not adequately cross-examine the victim regarding the circumstances of the pretrial identification. The petitioner noted that there was an "18-minute lap[se]" between the time the victim was presented with the photographic array and the point at which he identified the petitioner and that the victim "said he was 80 percent sure."

---

[1] We utilize the spelling of this individual's name as it appears in the transcript of the evidentiary hearing.

-3-

The petitioner also testified that trial counsel should have objected during the State's closing argument when the prosecutor told the jury not to "make the victim's trip from Nevada be in vain" and when he said that counsel had conceded the petitioner's guilt. The petitioner said that he specifically asked counsel to object, and counsel said, "I don't think we can object during closing arguments." The petitioner said that counsel "was uncertain" about whether he could object. The petitioner noted that, because of his inexperience, counsel had secured another attorney to sit at counsel table with him and that he "referred to [that attorney] quite a bit throughout the trial," giving the petitioner the impression that the other attorney "had tried a few more trials or had a little bit more experience in the trial arena" than trial counsel.

The petitioner said that counsel also represented him on appeal and that some of the issues counsel tried to raise on appeal were deemed waived by this court for counsel's failure to lodge a contemporaneous objection. The petitioner also claimed that this court stated that counsel had failed to properly challenge the sufficiency of the evidence as a stand-alone ground for relief. After this court denied relief on direct appeal, counsel told the petitioner that "he was going to have to retain another [attorney] to assist or aid him in filing" an appeal to the supreme court because counsel had "never done an appeal before and he didn't know exactly" how to do it. The petitioner said that "the bottom line" regarding the appeal process was that counsel "had never been there before, he didn't understand it, he didn't know, he was trying to get assistance, and . . . he kind of fumbled through it."

During cross-examination, the petitioner acknowledged that the State had extended a plea offer that encompassed the charge in this case as well as charges in an unrelated case and that counsel had encouraged him to accept the State's offer. The petitioner said that he refused to accept the plea offer in this case because he was not guilty. The petitioner recalled that shortly before trial, counsel told him that "he had a mock trial with some of his friends" that had resulted in counsel's friends finding the petitioner guilty. The petitioner told counsel that he "understood that, but the great part about that mock trial is that they're not [the] jury."

The petitioner stated that he "was gonna testify from day one" and that he only elected to forego his right to testify because counsel told him that the State would likely use his prior robbery convictions to impeach his testimony. He acknowledged that in addition to the aforementioned prior robbery convictions, he also had prior Georgia convictions for "felony false statement," aggravated assault, and being a felon in possession of a weapon, but he insisted that he "wasn't really concerned about the felony false statement" or his other convictions. The petitioner admitted that it was ultimately his decision not to testify, but he said that he would have chosen differently if he had known that trial counsel could have prevented the State from inquiring about his prior

-4-

convictions. The petitioner conceded that his testimony would have "[p]retty much" conveyed the same facts that were offered by Ms. Morris at trial.

The petitioner insisted that trial counsel could and should have subpoenaed the Comcast contractors, saying, there's a record of who these people are. He admitted, however, that he had not obtained any such record to present at the evidentiary hearing and had not called any witness from Comcast to verify his claims. The petitioner admitted that counsel had spoken to Ms. Morris, Ms. McGee, and Mr. Ceasar prior to trial.

The petitioner testified that trial counsel should have attempted to identify the person from whom the petitioner had allegedly purchased the victim's car and GPS unit even though the petitioner only knew the person by a nickname and "the area that he resided in." He insisted that with this meager information, "the investigator . . . could have went out there and actually walked up on the guy." The petitioner admitted that he had told the police that he purchased the car key and the GPS unit from someone whose nickname was Cat Daddy, but he maintained that "it's the same person . . . Cat Daddy and Polo." The petitioner told the police that he had paid Cat Daddy $500 to get the key and the GPS unit and had expected Cat Daddy to deliver the car to him later. The petitioner said that Cat Daddy told him "that he would have some complication with the tag . . . and that . . . once he got all that squared away, [the petitioner] would be able to get the automobile." The petitioner described his decision to enter into the purchase agreement with Cat Daddy as "a bad decision." The petitioner acknowledged that he had initially lied to the police and told them that the key belonged to his girlfriend's car, saying that he had lied because he thought "maybe there's complications with this car" and he "was trying to, you know, maybe get out of auto theft."

The petitioner said that Ms. McGee was his girlfriend and that she was present throughout the trial. The petitioner conceded that he was not privy to any discussions between counsel and Ms. McGee regarding her potential trial testimony. The petitioner also conceded that it was Ms. McGee who revealed to the police that the petitioner had lied about how he came to have possession of the victim's car key. The petitioner nevertheless maintained that counsel should have called Ms. McGee as a witness because he had promised the jury during his opening statement that he would do so.

With regard to his claim that counsel failed to adequately cross-examine the victim, the petitioner acknowledged that, during the victim's direct examination testimony, he stated that he could not identify the person who had robbed him, but the petitioner nevertheless maintained that he wanted his counsel to illicit that information

during cross-examination. The petitioner conceded that counsel questioned the victim at length about his inability to identify the perpetrator.

As to the petitioner's claim that counsel should have objected during the State's closing argument, the petitioner insisted that the prosecutor's statement that the jury should not make the victim's trip from Nevada to testify be in vain urged the jury to convict on an improper basis. He also argued that counsel should have objected when the prosecutor argued that counsel, by admitting that the petitioner possessed the victim's car key and GPS unit, had essentially conceded that the petitioner was guilty of at least the lesser included offense of theft. The petitioner acknowledged that although counsel did not contemporaneously object to the State's characterization of his statements, counsel did move for a mistrial following closing arguments on that precise basis. The trial court denied the motion.

Dea McGee testified that she had been dating the petitioner since 2009 and that he was the father of her seven-year-old daughter. She said that on the day of the offense, she and the petitioner helped Ms. Morris move into her new home. She said that she was with the petitioner for the entire day. Ms. McGee said that after she learned that the petitioner had been charged with a robbery that occurred on the same day of Ms. Morris' move, she told the petitioner's first attorney "that that was impossible" and that she, Ms. Morris, and Mr. Ceasar would testify that the petitioner had been helping Ms. Morris move on the day of the offense. Ms. McGee recalled that, on the day of the move, she and the petitioner joined Ms. Morris and Mr. Ceasar at Ms. Morris' apartment, and, from there, the group moved items from the apartment to the townhouse using a car and a van that Ms. Morris had borrowed from a friend. She said that the move was complete by 3:00 p.m. but that she and the petitioner stayed at Ms. Morris' new residence to eat and help her unpack. Ms. McGee said that she anticipated being called as a witness for the petitioner, but, after the trial, counsel told her "that the other testimony was good enough, from Teneal Morris."

During cross-examination, the State confronted Ms. McGee with Ms. Morris' trial testimony, which provided a markedly different account of the moving day than that provided by Ms. McGee on direct examination. Ms. Morris had testified that she and her boyfriend had moved the bulk of her items on November 5, 2011, and that Ms. McGee and the petitioner had only helped finish up with smaller items. In contrast to Ms. McGee's evidentiary hearing testimony that the group made several trips between the apartment and the townhouse, Ms. Morris testified at the petitioner's trial that the group had made a single trip from the apartment to the townhouse.

Brian Ceasar, the petitioner's cousin, testified that on November 6, 2011, he and the petitioner helped Ms. Morris move from her apartment into a townhouse. He

recalled that the petitioner and Ms. McGee picked him up in the morning and that they had their children with them. Mr. Ceasar said that they moved "just the whole house basically. . . . Beds, couches, dressers, stuff like that." Mr. Ceasar said that he specifically recalled "carrying a bunch of heavy stuff down" from Ms. Morris' second floor apartment. He said that the group made at least three trips back and forth between Ms. Morris' old residence and her new one. Mr. Ceasar recalled that the move was completed "late in the evening" and that they "hung out, had some drinks, ate" after the move was finished. He said that the petitioner and Ms. McGee dropped him off at his residence "late in the evening, enough to call it a night." Mr. Ceasar said that he had agreed to testify for the petitioner but that he had not received a subpoena. He testified that although he told Ms. McGee that he was willing to be a witness, he did not ever speak with trial counsel about his testimony.

Counsel, who began practicing law in 2013, testified that he was appointed to represent the petitioner and that the petitioner's trial was actually the first jury trial he conducted. The petitioner's appeal was also counsel's first appeal. Counsel described how he came to represent the petitioner:

> So, it was back when CJC was still there, I was visiting a client, and [the petitioner] back in the conference area asked me how much I would charge for a particular case, I gave him the quote, and he said okay. He proceeded to want to chat with me about his case, I told him I couldn't because he had counsel. The next day I got a text message from the court staff saying that "hey, where are you, your client's here," I had no idea who they were talking about, so I came up from the office and low and behold it was [the petitioner] claiming to the Court that he had retained me, which was absolutely not true. I believe . . . I went to the CJC on a Thursday, we came into court for this incident on Friday and he had trial with Mr. Engle on Monday. I told the Court that that wasn't true and then the Court proceeded to appoint me to the case, and that's how I became [the petitioner's] attorney.

Counsel recalled that, at the time of his appointment, the petitioner was facing "a total of four aggravated robbery charges." He said that the petitioner's trial in this case did not go to trial for "close to a year" or "maybe even longer." Counsel said that he relied heavily on the advice of his partner, an attorney with considerably more experience, when developing his trial strategy.

Counsel testified that the petitioner had an extensive criminal history and that counsel believed "it would be basically a miracle for [the petitioner] to be able to testify without opening the door to these other cases, including the ones that were open at the time." Counsel said that he and his partner explained the situation to the petitioner, and that the petitioner "very quickly became not interested in testifying." It was counsel's belief "that the reason that [the petitioner] changed his mind was because we had discussed with him the potential of all these cases being presented to the jury." Counsel said that every time they discussed the issue of the petitioner's testifying, counsel "explained to [the petitioner] why it was a very dangerous thing for him to get up there and testify" and "that there was a lot of pitfalls there." He recalled that the petitioner "completely agreed and voluntarily signed that waiver." Counsel testified that he filed a motion in limine to exclude the petitioner's prior bad acts and that the trial court granted the motion.

Counsel said that he and the petitioner settled on the alibi defense on "day one" and that he tried to use the availability of multiple alibi witnesses to the petitioner's advantage during plea negotiations with the State. Counsel stated that he "was in contact with Ms. McGee throughout" but that he was unable to speak to Mr. Ceasar despite his efforts to do so. Counsel said that either Ms. McGee or the petitioner provided him with a telephone number for Mr. Ceasar and that he had left messages at that number but never received a return call; he did not have Mr. Ceasar's address. He said that he spoke with Ms. Morris "a couple of times about her testimony." Counsel acknowledged that his original notice of alibi witnesses did not include Ms. McGee's name because he "was never told that she had knowledge of him not being there." After he learned that Ms. McGee could verify the petitioner's alibi, he filed an amended notice that added her name as a witness. As to the petitioner's desire to call Cat Daddy as a witness, counsel said that the petitioner told counsel he "could go to that area because [Cat Daddy] was a known fence and . . . just ask around for him." He said that the petitioner told him that Cat Daddy frequented the parking lot of a specific apartment complex but provided no more specific information.

Counsel said that, in preparing Ms. Morris to testify, he performed a mock direct examination but did not perform a mock cross because it was his first trial, and he "had no idea what to expect from [the prosecutor], as far as cross goes." Counsel agreed that he told the jury during his opening statement that he would call Ms. Morris, Ms. McGee, and Mr. Ceasar as witnesses, and he recalled that all three witnesses were present on the first day of trial. Mr. Ceasar did not return on the following day "because he had to be at work, and that was it for him." Counsel said that Mr. Ceasar had not told him that he needed a subpoena to be able to return, saying, "I didn't even know he had a job, so no, I didn't know any of that." He said that he did not anticipate that there would be an issue with Mr. Ceasar's returning to testify because the witnesses "were basically

-8-

chomping at the bit to come and tell their side of the story." Neither he nor Ms. McGee made any attempt to contact Mr. Ceasar. Counsel said that he elected not to call Ms. McGee, who had returned on the second day, because Ms. Morris' testimony, despite having done "a pretty good job as far as . . . giving an alibi," was "inconsistent" with what he had been told by Ms. McGee. He explained,

> [T]he problem that I had at the time was that I did want to call three of them, but didn't want to put up three witnesses that were going to tell three different stories, so I just relied on the fact I got one story out there, it does seem believable, she did seem somewhat credible, though entertaining, I didn't want to put up two more witnesses that were gonna come in there and basically break that entire testimony down and discredit her, and so I felt that strategically it would be a better decision to just let that testimony ride instead of calling somebody else that could've just completely sank the ship on it.

He said that, ultimately, he believed that offering Ms. McGee's testimony, which he characterized as "completely different" from that offered by Ms. Morris, "would do more harm than good." He agreed that, because Ms. McGee was the petitioner's girlfriend and mother of his child, she could be viewed as more biased than Ms. Morris. Counsel also agreed that the State's cross-examination of Ms. McGee could have emphasized the fact that the petitioner lied to police when initially confronted about his possessing the victim's property because it was Ms. McGee that exposed the lie in the first place.

Counsel testified that "it was a little embarrassing" to forego testimony from Ms. McGee and Mr. Ceasar after he had promised the jury that they would hear from those witnesses, but he insisted that he "was more worried about . . . our entire defense self-destructing because of conflicting defense witnesses."

During cross-examination, counsel clarified that he never told the petitioner "that if he gets on the stand his record will come in" but instead "told him that, if he gets up there and he opens the door, then they can bring these things in." Counsel testified that he "[a]bsolutely" prepared the petitioner to testify by performing a mock direct and cross-examination "about a week before trial" and that, "[e]very single time," the petitioner opened the door to his prior bad acts. He said that although the trial court granted his motion to exclude the petitioner's prior bad acts, it was his "impression that [the petitioner] would have opened the door and then he would have been able to have been asked about those things." Counsel acknowledged that he did not specifically ask the trial court to rule on the admissibility of the petitioner's prior convictions as opposed to his prior bad acts.

Counsel conceded that he did not consult the petitioner when deciding which issues to present on appeal and that another attorney with more appellate experience drafted the majority of the brief in the petitioner's case.

Counsel testified that Ms. Morris' testimony at trial was "different than what we had talked about" prior to trial and that her recitation of the events of November 6, 2011, "was so different" from that offered by Ms. McGee that he "didn't want them to get up and give the State more ammunition to argue against" the petitioner. He acknowledged that he did not interview Ms. Morris until the first day of trial, explaining that "[i]t's basically impossible" to "get a hold [of] some people when it's time to go to trial." He said,

> I can't go to their house and make them talk to me. I can't make them call me back. . . . I had tried to talk to them, no one's calling me back, no one's coming to my office. I believe I set up times to meet with them and they never showed up for it, I mean . . . it's not that cut and dry, it's not in a vacuum. I can't just say, "Hey, I need to talk with you and interview today," and then it happens.

Counsel testified that he did speak with Ms. Morris by telephone prior to trial and that her version of events provided during those conversations was "more like what Ms. McGee would testify to today." When Ms. Morris took the stand, however, she offered a different version of events. He said that Ms. McGee and Mr. Ceasar "claim that the house wasn't moved, and the alibi witness claimed that the house had been moved out, and that they came to basically get the last little bits of it." He said that he felt that the inconsistencies in the stories were sufficient to damage the petitioner's case. He said that Ms. Morris' testimony "set it up to the point where all [Ms. McGee and Mr. Ceasar] would do is be able to come in and destroy our alibi." Counsel testified that he did not perform a redirect examination of Ms. Morris, explaining that he thought it was unnecessary.

Regarding his cross-examination of the victim, counsel said that the victim had failed to identify the petitioner despite standing up and looking "at everybody in the room," so "there was no way" that counsel "was gonna get out and try to hammer anything else out of him" and risk giving the victim an opportunity to realize his mistake. He testified that the State made multiple attempts to have the victim identify the petitioner, but, eventually, it became clear that the victim could not identify the petitioner. He said, "I wasn't gonna open that back up, no way." Counsel characterized the victim's failure to identify the petitioner as very damaging to the State. He recalled

-10-

that, following the victim's testimony, the State extended a plea offer that provided for a total effective sentence of 10 years with a 45 percent release eligibility in exchange for the petitioner's pleading guilty to all of the pending aggravated robbery charges. Counsel said that he took the offer to the petitioner and told the petitioner that although he felt the trial was going well, "it's a good offer." The petitioner elected to go forward.

Counsel testified that "of course" he knew "that you could object during closing arguments" but said that he "didn't think that what [the prosecutor] had done rose to the level of prosecutorial misconduct." He said that he did believe the argument "was suspect" and, as a result, he objected "on the end of the closings, put on the record to preserve it for potential appeal."

Counsel acknowledged that he did not raise on appeal every issue that was raised in the motion for new trial, explaining that he believed that the issues he raised were the strongest of the lot. He said that he worked with another attorney on the appeal and that it was the consensus belief that raising too many issues would dilute the stronger ones.

At the conclusion of the hearing, the post-conviction court took the petition under advisement. The court denied relief via written order, finding that the petitioner had failed to prove by clear and convincing evidence sufficient facts to support a finding that he was deprived of the effective assistance of counsel.

The post-conviction court found that the petitioner "wanted to testify on his own behalf, but he was afraid his prior convictions would be used against him if he did" and that "counsel was concerned that [the p]etitioner's prior criminal convictions could be used against him if he testified." The court concluded that although counsel performed deficiently by failing to move the trial court to exclude the petitioner's prior convictions pursuant to Tennessee Rule of Evidence 609, the petitioner had failed to establish that, but for counsel's error, the outcome of the trial would have been different. The court observed that even if the petitioner's prior robbery convictions had been excluded, his "conviction from 2003 for 'Felony False Statement' would have been admitted" and that, during the *Momon* colloquy, the petitioner indicated "that he voluntarily chose not to testify." The court determined, having heard the petitioner's testimony at the evidentiary hearing, that his testimony would not have affected the outcome of the trial.

The post-conviction court observed that the testimony offered by Ms. McGee and Mr. C[ea]sar "differs slightly from that of Ms. Morris, who testified at trial" in that "Ms. Morris testified that the large furniture items were moved the day before, on Saturday, and that all that was left on Sunday were boxes and kitchen items" while "Mr.

C[ea]sar testified that the large items were moved on the day he and [the p]etitioner were assisting Ms. Morris, a Sunday." Noting this discrepancy on the day and the fact that the petitioner and his witnesses at the evidentiary hearing were confident of the presence of the Comcast technician on the day they helped Ms. Morris move, the court "question[ed] whether any service company would be doing routine installations on a Sunday evening" and said that "[p]erhaps" it was "more likely" that the installation occurred on the Saturday before, when Ms. Morris said that the bulk of the move took place. The court found that "[g]iven the nature of the other evidence," the petitioner had failed to establish "that having multiple people give differing versions of the alibi would have resulted in a different outcome at trial" and that, "[i]n fact, it may have weakened the alibi defense." The post-conviction court found that "counsel's decision not to call additional alibi witnesses when their stories differed is a legitimate strategic decision in this case."

As to counsel's promise during opening statement that he would call Ms. McGee and Mr. Ceasar, the post-conviction court observed that "[i]t would have been much better practice for trial counsel in this case to have conducted a more in-depth interview of potential alibi witnesses" so that he could "more accurately represent what the evidence would show during his opening statement." The court concluded, however, that the petitioner had failed to demonstrate any prejudice flowing from counsel's error because their testimony would have been cumulative to Ms. Morris' testimony.

The post-conviction court found that counsel fully prepared Ms. Morris to testify at trial and, citing the trial transcript, that, "[a]fter her cross[-]examination, trial counsel did a redirect with Ms. Morris wherein she was able to tell the jury her reasons for coming forward with her alibi information at trial."

The post-conviction court found that trial counsel did not perform deficiently in his cross-examination of the victim. The court also found that trial counsel did not perform deficiently by failing to object to the State's assertion during closing argument regarding certain concessions allegedly made by the petitioner because, as evidenced by the trial court's ruling on the petitioner's motion for a mistrial based on those same statements, the argument was not improper. The court noted that "it would have been appropriate for counsel to object" "when the State entreated the jury not make the victim's trip to testify at trial be in vain" but found "there has been no showing that the outcome of the trial would have been different had trial counsel objected." The post-conviction court classified the prosecutor's statement as "relatively innocuous" and determined that it "unlikely had any effect on the jury verdict in light of the evidence as a whole."

Finally, the post-conviction court found that, although counsel did not present a challenge to the sufficiency of the evidence "as a 'stand alone' issue in the

appeal," this court considered the issue anyway and that, as a result, the petitioner cannot establish that he was prejudiced by counsel's decision. Additionally, the court found that the petitioner had failed to make any showing that he "would likely have prevailed on appeal had these issues been asserted."

In this appeal, the petitioner reiterates his claims of ineffective assistance of counsel.[2] The State asserts that the post-conviction court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

---

[2]     It appears that the petitioner might also be attempting to assert that counsel's failure to locate and present the testimony of the Comcast technician and to present the testimony of Ms. McGee and Mr. Ceasar violated principles of due process by hampering his constitutional right to present a defense. This issue was not litigated at the evidentiary hearing, and, accordingly, we will not address it in this appeal.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The petitioner first asserts that counsel performed deficiently by failing to interview Ms. McGee and Mr. Ceasar prior to trial and by failing to offer them as witnesses at trial even after he promised the jury that he would do so. The record supports the post-conviction court's conclusion that, although it would have been better for trial counsel to interview the witnesses before trial and particularly before promising the jury what their testimony would be, the petitioner cannot establish that he was prejudiced by counsel's deficient performance. The record indicates that the testimony offered by Ms. McGee and Mr. Ceasar differed from that offered by Ms. Morris. In contrast to the testimony offered by Ms. McGee and Mr. Ceasar at the evidentiary hearing, Ms. Morris testified that she and others had moved the bulk of her possessions, including all of the furniture and other heavy items, on the day before the petitioner, Ms. McGee, and Mr. Ceasar arrived to help. Counsel testified that Ms. Morris' testimony was different from the account she had provided during their previous meeting and from that provided to him by the petitioner and Ms. McGee. He said that he concluded that it would be better to offer only Ms. Morris' testimony than to risk admitting inconsistent testimony from other witnesses. We agree with the post-conviction court that this qualifies as a reasonable strategic decision.

Similarly, we cannot say that counsel's failure to present Ms. McGee and Mr. Ceasar as witnesses in light of his promise during opening statements that he would do so actually affected the outcome of the petitioner's trial. To be sure, counsel should have interviewed the witnesses prior to trial to lessen the chances of his being caught off guard by differences in their testimony. As indicated, however, the record establishes that Ms. Morris' testimony on direct examination differed from the account that she had already provided to counsel. Counsel should have attempted to explain to the jury the absence of the two witnesses, but the record does not support a conclusion that the result of the trial would have been different had he done so. Originally charged with aggravated robbery, the petitioner was convicted of the lesser included offense of robbery, an offense that was overwhelmingly supported by the evidence adduced at trial.

As to the petitioner's claim that counsel should have located and presented the testimony of Cat Daddy and the Comcast technician, we observe that the petitioner similarly failed to locate and present the testimony of these witnesses at the evidentiary hearing. In consequence, he cannot prevail upon his claim. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing.").

The petitioner next contends that counsel performed deficiently by failing to adequately prepare Ms. Morris to testify and by failing to adequately rehabilitate her testimony during redirect examination. Counsel's accredited testimony established that he interviewed Ms. Morris on the morning of the first day of trial and that he was aware of the gist of her testimony prior to that from his discussions with Ms. McGee. During redirect examination, counsel asked the witness if the petitioner's trial was essentially the first opportunity she had had to tell the court about the petitioner's alibi. In our view, the petitioner has failed to show that any further action would have altered the outcome of the trial and, in consequence, he is not entitled to relief on this issue.

The petitioner asserts that counsel failed to adequately prepare him to testify, failed to seek a pretrial ruling on the admissibility of his prior convictions, and that counsel's failure to perform these tasks negatively affected his decision not to testify in this case. We agree with the post-conviction court that counsel performed deficiently by failing to seek a pretrial ruling pursuant to evidence rule 609 on the admissibility of the petitioner's prior convictions. That being said, as the post-conviction court points out, even if the petitioner's prior robbery convictions had been excluded, his conviction of "felony false statement" would not have been. Moreover, counsel testified that he did prepare the petitioner to testify by conducting mock direct and cross examinations and that "every single time" the petitioner opened the door not only to his prior convictions but to the other four robbery charges pending against the petitioner at the time of the trial in this case. Additionally, during the *Momon* colloquy, the petitioner unequivocally indicated that he voluntarily elected not to testify. Under these circumstances, the petitioner is not entitled to relief on this issue.

The petitioner avers that counsel failed to adequately cross-examine the victim, asserting that counsel should have forced the victim to "clearly and unequivocally state that he could not identify" the petitioner as the perpetrator in this case. Counsel testified, however, that despite repeated attempts by the State to have him identify the petitioner, the victim did not do so. At one point, the prosecutor asked the victim to stand and look around the courtroom to be sure he could not identify the perpetrator, and the victim could not do so even after looking "at everybody in the room." Counsel said that

given this powerful display, "there was no way" he was going to question the victim further on the issue and give the victim an opportunity to realize his mistake. In our view, this qualifies as a reasonable tactical decision.

The petitioner claims that counsel performed deficiently by failing to lodge contemporaneous objections during the State's closing argument. In our view, the record supports the conclusion of the post-conviction court that, even if counsel should have objected to at least one of the challenged statements, the petitioner cannot establish that he was prejudiced by counsel's failure. The prosecutor's statement that the petitioner's admission that he possessed the victim's key and GPS unit amounted to a concession that the petitioner possessed stolen property was essentially a correct statement of the law. When viewed in context of the argument as a whole, the prosecutor's suggestion that the jury not make the victim's trip to testify be in vain appears to be more of a suggestion that the jury not wholly discount the victim's testimony because he was unable to identify the petitioner in court than a request that the jury convict the petitioner on an improper basis. The petitioner is not entitled to relief on this issue.

Finally, the petitioner asserts that counsel performed deficiently on appeal by enlisting the assistance of another attorney in drafting the petitioner's brief, by abandoning some of the issues raised in his motion for new trial, and by failing to present a stand-alone challenge to the sufficiency of the evidence. "Counsel is not constitutionally required to argue every issue on appeal," *State v. Matson*, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986) (quoting *State v. Swanson*, 680 S.W.2d 487, 491 (Tenn. Crim. App. 1984)), and, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues," *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). The determination to raise or forego an issue on appeal is a matter "generally within appellate counsel's sound discretion," *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *Jones*, 463 U.S. at 751; *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993)), and, as a result, counsel's decision in this regard "should be given considerable deference", *Carpenter*, 126 S.W.3d at 887 (citing *Campbell v. State*, 904 S.W.2d 594, 597 (Tenn. 1995); *Strickland*, 466 U.S. at 689).

Typically, to determine whether the petitioner is entitled to relief based upon counsel's failure to raise an issue on appeal, this court must examine the merit of the omitted issue. Here, however, the petitioner has failed to point to any specific issue, other than the sufficiency of the evidence, that he wanted counsel to raise on appeal, and this court addressed the sufficiency of the convicting evidence on direct appeal despite counsel's failure to raise the issue. Under these circumstances, the petitioner cannot

establish either that counsel performed deficiently or that he was prejudiced by counsel's action.

Additionally, we note that there is absolutely no merit to the petitioner's claim that counsel performed deficiently by enlisting the assistance of a more experienced attorney in drafting the brief in this case. This was counsel's first time representing anyone on appeal, and his decision to consult a more experienced attorney for guidance is to be commended instead of condemned.

Accordingly, we affirm the judgment of the post-conviction court.

_____
JAMES CURWOOD WITT, JR., JUDGE